*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RUSSELL CHARLES GOVETT IV,

        Defendant-Appellant.

UNPUBLISHED
May 14, 2020

No. 342639
Wayne Circuit Court
LC No. 17-005152-01-FC

Before: K. F. KELLY, P.J., and BORRELLO and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions of two counts of first-degree premeditated murder, MCL 750.316(1)(a), one count of second-degree murder, MCL 750.317, larceny in a building, MCL 750.360, felon in possession of a firearm, MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm). The trial court sentenced defendant to life imprisonment without parole for each first-degree murder conviction, parolable life imprisonment for the second-degree murder conviction, and concurrent prison terms of two to four years for the larceny conviction and two to five years for the felon-in-possession conviction, which were to be served consecutive to a two-year term of imprisonment for the felony-firearm conviction. For the reasons set forth in this opinion, we affirm the convictions and sentences of defendant.

## I. BACKGROUND

Defendant's convictions arise from the February 3, 2017 deaths of housemates Bruce Nicaise, Paul McBride, and Eric Bouford at a drug house on Sherwood Street in Detroit. Two days earlier, defendant drove his mother, Denise Sinclair, and his sister, Rachel Miller, to the house to purchase drugs from McBride. Sinclair gave McBride the keys and title to her Chevrolet Impala as security for the purchase. After Sinclair left, defendant and Miller remained at the house and requested from McBride more drugs but McBride was unwilling to sell more drugs without payment. Later that day, McBride left the house and defendant became involved in an argument with Nicaise because Nicaise intended to sell the Impala before defendant could pay the underlying drug debt. At some point, the argument escalated and defendant struck both Bouford and Nicaise

with a log-splitting maul, killing them. Defendant claimed that he acted because Bouford reached for a shotgun, and Nicaise produced a handgun. McBride returned to the home after defendant had killed Bouford and Nicaise, and Jordan Hering also arrived at the same time to buy drugs. Defendant then shot McBride, and then he and Miller proceeded to cleaned the house with bleach. Defendant stole pills and cash from McBride's person.

After defendant found the title and keys to Sinclair's Impala, defendant and Miller rode with Hering and Hering's friend, Derek Glowacki, to the location where McBride had parked the Impala. Defendant and Miller then drove to Cape May, New Jersey where he remained until captured by police. Detroit Police Detective Moises Jimenez transported defendant back to Michigan. After advising defendant of his *Miranda*[1] rights, defendant initially refused to speak, but he then said that if he received written confirmation that Miller would not be charged, he would give the police all the information he had about what happened at the Sherwood house.

Hering was reluctant to contact the police after the offense because he had violated his parole by going to a drug house and because defendant had taken Hering's driver's license and threatened him if he went to the police. On February 4, Hering returned to the Sherwood house to look for drugs. He took McBride's cell phone and used it to send an anonymous text message to one of McBride's contacts, to inform her that McBride and his housemates had been killed.

Defendant was charged with first-degree premeditated murder and first-degree felony-murder for the three homicides, felon in possession of a firearm, larceny in a building, and felony-firearm. Defendant represented himself in all phases of the proceedings, assisted by court-appointed standby counsel. The defense theory at trial was self-defense. Defendant testified that he killed Nicaise and Bouford because he thought they intended to shoot him during the argument about the Impala. He stated that he shot McBride because he thought McBride would kill him and Miller after McBride discovered that Nicaise and Bouford had been killed.

The jury found defendant guilty of first-degree premeditated murder for the deaths of Nicaise and McBride, and second-degree murder for Bouford's death. The jury also found defendant guilty of larceny from a building, and the felon-in-possession and felony-firearm charges. Defendant moved for an evidentiary hearing and a new trial, alleging that the prosecutor withheld exculpatory evidence. Following an evidentiary hearing, the trial court denied the motion.

This appeal followed. On appeal, defendant raises issues in a brief filed by appointed appellate counsel and in a pro se brief filed by defendant pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4 ("Standard 4 brief").

## II. SUPPRESSION OF DNA EVIDENCE

In his brief on appeal, defendant argues that the prosecutor violated his right to due process by withholding exculpatory DNA evidence in violation of *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). Defendant asserts that the prosecutor failed to disclose defendant

---

[1] *Miranda v Arizona*, 384 US 436, 473-474; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

was excluded as the donor of DNA on swabs of various items and areas inside the Sherwood house. The prosecutor testified at a posttrial evidentiary hearing that all reports were provided to defendant, and that several swabs were never forwarded to the crime lab for analysis because they were not believed to be of evidentiary value.

Constitutional issues are reviewed de novo. *People v Shafier*, 483 Mich 205, 211; 768 NW2d 305 (2009). "A trial court's decision to deny a motion for a new trial is reviewed for an abuse of discretion." *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008). "An abuse of discretion occurs only 'when the trial court chooses an outcome falling outside [the] principled range of outcomes.' " *Id.* (citation omitted). A trial court's findings of fact may not be set aside unless clearly erroneous. "In the application of this principle, regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C). "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Antwine*, 293 Mich App 192, 194; 809 NW2d 439 (2011) (quotation marks and citation omitted).

The prosecutor is required to disclose material evidence favorable to the defense. *Brady*, 373 US 83; *People v Fox (After Remand)*, 232 Mich App 541, 549; 591 NW2d 384 (1998). Failure to provide exculpatory information to a defendant violates a defendant's right to due process. *Brady*, 373 US at 87; *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007). To establish a *Brady* violation, a defendant must show that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) viewed in its totality, the evidence was material. *People v Chenault,* 495 Mich 142, 155; 845 NW2d 731 (2014),

The assistant prosecutor who tried the case (the prosecutor) testified at the evidentiary hearing that Lori Nielsen's technician's report listed the items she collected from the Sherwood house, including several swabs. This was not a list of swabs submitted for DNA analysis, because Nielsen did not make the decision about which items to test. The prosecutor explained that the crime lab generally will not analyze 20 to 30 or more swabs, so the prosecutor usually identifies which items are most likely to have evidentiary value. According to the prosecutor, defendant was provided with Nielsen's reports, including reports indicating which swabs were tested for DNA. There was no secondary report that the prosecutor received but did not disclose to defendant. At trial, defendant denied receipt of a "case supplemental report" from Nielsen before trial, but the prosecutor asserted that the report was provided to defendant along with all other reports. At the evidentiary hearing, the prosecutor explained that Nielsen's reports were reformatted when printed for discovery, so the reports in the prosecutor's binder looked different than the reports provided to defendant, but the content was identical. The trial court found this explanation credible and found that the prosecutor did not withhold any evidence.

Our review of the record evidence submitted leads us to conclude that the trial court's finding that defendant was provided all of the prosecutor's reports relative to the DNA testing was not clearly erroneous. MCR 2.613(C). Therefore, defendant failed to satisfy the first requirement, namely, that the prosecutor suppressed evidence.

Additionally, defendant has not shown that the challenged evidence was material. "To establish materiality, a defendant must show that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A

-3-

"reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Chenault*, 495 Mich at 150 (citation omitted). Defendant does not clearly explain the materiality of DNA evidence. The prosecutor did not rely on DNA evidence to establish defendant's guilt, but principally relied on the testimony of Miller and Hering. Defendant suggests that he assumed that his DNA was found on mattresses or dresser drawers, but this assumption was not founded on anything the prosecutor said or argued. Defendant also implies that evidence regarding Hering's DNA, but not defendant's DNA, existed on these objects which would have been material had such evidence been produced, or existed. However, the jury was already aware from the testimony that defendant's DNA was not found, but that defendant had used bleach to clean several items, and that Hering participated in the ransacking of the house after the offenses and returned later to search for drugs and steal McBride's phone. Moreover, the ransacking of the house was secondary to the bludgeoning, shooting, and thefts, all of which defendant admitted. To the extent defendant advances an argument that he could have devoted more attention to proving his state of mind if he did not have to address the ransacking evidence, we find such an argument devoid of merit. Defendant has failed to identify any record evidence from which this Court could conclude that his alleged concern about the possible presence of DNA and the ransacking evidence precluded him from offering his testimony that he killed Nicaise, Bouford, and McBride out of fear for himself and his sister.

In the absence of evidence that the prosecutor suppressed evidence coupled with the failure by defendant to demonstrate that the alleged evidence was favorable or exculpatory relative to his defense, the trial court did not abuse its discretion by denying defendant's motion for a new trial.

## III. ACCESS TO ELECTRONIC DISCOVERY

Defendant next argues in his appeal that his due-process rights were violated because he was not provided an adequate opportunity to review electronic discovery materials before trial. Defendant did not preserve this issue by raising a due-process claim in the trial court before or at trial. However, defendant raised this issue in his posttrial motion for a new trial. We review an unpreserved claim of constitutional error for plain error affecting defendant's substantial rights. *Shafier*, 483 Mich at 211. We review the trial court's decision denying defendant's motion for a new trial for an abuse of discretion." *Miller*, 482 Mich at 544. Defendant also raises related claims of a *Brady* violation and ineffective assistance of counsel, neither of which were raised in the trial court. Accordingly, we also review defendant's *Brady* claim for plain error affecting defendant's substantial rights, *Shafier*, 483 Mich at 211, and our review of defendant's ineffective-assistance claim is limited to "errors apparent on the record." *People v McFarlane*, 325 Mich App 507, 527; 926 NW2d 339 (2018).

The factual premise of this claim is that defendant's standby counsel did not have a laptop computer to facilitate his review of discovery materials, and that defendant had only a limited opportunity to review the materials. Because defendant does not contend that the prosecutor failed to disclose any of the materials, his claim of a *Brady* violation is without merit, given that no evidence was suppressed. *Chenault,* 495 Mich at 155.

"To demonstrate ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient, and that there is a reasonable probability that but for that deficient performance, the result of the trial would have been different." *People v Hoang*, 328 Mich App

45, 64; 935 NW2d 396 (2019) (quotation marks and citation omitted). In this case, however, defendant represented himself throughout the proceedings. "[A] defendant who chooses to represent himself does so at his own peril. With no constitutional right to an attorney, a defendant proceeding *in propria persona* has no basis to claim that the attorney must abide by constitutional standards." *People v Kevorkian*, 248 Mich App 373, 424; 639 NW2d 291 (2001). Although defendant was assisted by standby counsel, having chosen to represent himself, he "may not now assign blame for his conviction" to his standby counsel. *Id*. at 426. A standby counsel does not act "as counsel within the meaning of the Sixth Amendment or Const 1963, art 1, § 13 and, therefore, cannot be held to the standards of effective assistance required of trial counsel." *Id*. at 427.

Our review of the record leads us to conclude that defendant's claim that standby counsel was ineffective by failing to facilitate defendant's access to discovery because he did not have a laptop is without merit. The record reveals that that arrangements were made to provide a laptop computer for defendant and standby counsel to use, and defendant was able to use the laptop to view videos in the witness room or jury room. Accordingly, the record is devoid of any basis on which we could conclude that standby counsel's lack of a computer affected the outcome of this matter.

Additionally, analyzing defendant's claim as a general due-process claim, "principles of due process are implicated where there is a claim of lack of adequate time to prepare for trial." *People v Suchy*, 143 Mich App 136, 142; 371 NW2d 502 (1985), leads us to a similar conclusion. Again, the record discloses that arrangements were made for defendant to review the electronic discovery materials on a laptop, and that defendant had at least two days to review the videos, with each session lasting several hours. The prosecutor testified at the evidentiary hearing that he verified that defendant was able to view and hear the videos before he left. Accordingly, the record does not support defendant's claim of a due-process violation, and the trial court did not abuse its discretion by denying defendant's motion for a new trial with respect to this issue.

IV. JAIL CALL USED AS IMPEACHMENT

Defendant raises multiple claims of error related to the prosecutor's use of a portion of a recorded jail telephone call by defendant to impeach defendant's testimony on cross-examination. He argues through his appellate counsel that the prosecutor's failure to disclose the entire recorded call at or before trial constituted a *Brady* violation, and he further argues in his Standard 4 brief that failure to provide the recording before trial violated MCR 6.201 and that the trial court's failure to allow him to introduce the entire call violated MRE 106.

A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *People v Jackson*, 498 Mich 246, 257; 869 NW2d 253 (2015). "We review a trial court's decision regarding the appropriate remedy for a discovery violation for an abuse of discretion." *People v Dickinson*, 321 Mich App 1, 17; 909 NW2d 24 (2017). However, because defendant did not argue below that the prosecutor was required pursuant to *Brady* to disclose the phone call before using it for impeachment, we review that unpreserved issue for plain error affecting defendant's substantial rights. *Shafier*, 483 Mich at 211.

-5-

To the extent defendant now frames this issue as a *Brady* violation, we reject his claim of error because the evidence involves defendant's own statements. It defies common sense to opine that the prosecutor could have suppressed defendant's own statements. Defendant's inability to remember fully or exactly what he said during the entire call was not caused by the prosecutor. Additionally, defendant does not explain how other portions of the call were favorable to him or how it was material.

For his evidentiary challenge, defendant relies on MRE 106, which provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." The trial court denied defendant's request for a recess to listen to the full recording, but contrary to what defendant states in his brief, the trial court permitted defendant to address other portions of the call on redirect examination. Defendant declined this opportunity. In the absence of record evidence explaining any basis of error for admission under MRE 106, we cannot glean any evidence that the trial court abused its discretion in admission of the telephone call.

Defendant complains that the prosecutor failed to produce the call in response to defendant's discovery requests. "We review a trial court's decision regarding the appropriate remedy for a discovery violation for an abuse of discretion." MCR 6.201 provides, in pertinent part:

> (A) Mandatory Disclosure. In addition to disclosures required by provisions of law other than MCL 767.94a, a party upon request must provide all other parties:
>
> * * *
>
> (2) any written or recorded statement, including electronically recorded statements, pertaining to the case by a law witness whom the party may call at trial, except that a defendant is not obliged to provide the defendant's own statement . . . .
>
> * * *
>
> (B) Discovery of Information Known to the Prosecuting Attorney. Upon request, the prosecuting attorney must provide each defendant:
>
> * * *
>
> (3) any written or recorded statements, including electronically recorded statements, by a defendant, codefendant, or accomplice pertaining to the case, even if that person is not a prospective witness at trial . . . .
>
> * * *
>
> (J) Violation. If a party fails to comply with this rule, the court, in its discretion, may order the party to provide the discovery or permit the inspection of

-6-

materials not previously disclosed, grant a continuance, prohibit the party from introducing in evidence the material not disclosed, or enter such other order as it deems just under the circumstances. Parties are encouraged to bring questions of noncompliance before the court at the earliest opportunity. Willful violation by counsel of an applicable discovery rule or an order issued pursuant thereto may subject counsel to appropriate sanctions by the court. An order of the court under this section is reviewable only for abuse of discretion.

To obtain relief for a discovery violation, a defendant must establish that he was prejudiced by the violation. *Dickinson*, 321 Mich App at 17-18.

The prosecutor explained at the evidentiary hearing that he did not provide the recording to defendant before trial because he did not intend to use it in his case-in-chief and it was not exculpatory. The prosecutor pointed out that during the call, defendant referred to his prior conviction of delivery of a controlled substance causing death. The prosecutor did not dispute defendant's assertion that he had requested recordings of all jail calls. To the extent that the prosecutor violated MCR 6.201(B)(3) by failing to provide the calls in response to defendant's request, it would have been appropriate for the trial court to remedy the violation by allowing defendant a brief recess to listen to the entire recording before deciding whether to proceed with redirect examination.

To be entitled to relief now, defendant must demonstrate that he was prejudiced by any violation. *Dickinson*, 321 Mich App at 18. In the portion of the call that was admitted by the prosecutor, defendant told his brother he would wait and see what happened at the preliminary examination before deciding on a defense strategy. Defendant asserts that if he had been allowed to listen to the entire call, he could have formulated a defense strategy of showing that he was merely trying to explain the legal process to his brother. However, defendant does not explain why he needed to listen to other portions of the call to provide that explanation. Indeed, defendant has not offered any evidence showing that other portions of the call actually would have supported such an explanation. Moreover, as the trial court observed, the call involved defendant's own statements. Even if defendant could not recall all of his prior telephone conversations, after being confronted with evidence of a specific discussion with his brother that took place before the preliminary examination, he should have been able to recall, and was free to offer, context for that discussion.

Accordingly, defendant has not demonstrated that he was prejudiced by any discovery violation.

## V. SUPPRESSION OF STATEMENT

Defendant argues that the trial court erred by denying his motion to suppress his statement to the police in which he offered to answer questions and tell what happened at the Sherwood house if he received written assurance that his sister, Miller, would not be charged. The trial court's factual findings when ruling on a motion to suppress evidence are reviewed for clear error. *People v Tanner,* 496 Mich 199, 206; 853 NW2d 653 (2014). A trial court's factual findings are clearly erroneous when this Court is left with a definite and firm conviction that the trial court made a mistake. See *People v Johnson*, 502 Mich 541, 565; 918 NW2d 676 (2018). "The decision

whether to admit evidence is within a trial court's discretion. This Court reverses it only where there has been an abuse of discretion." *People v Katt*, 468 Mich 272, 278; 662 NW2d 12 (2003). A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *Johnson*, 502 Mich at 564. "To the extent that the trial court's ruling involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *Tanner*, 496 Mich at 206 (cleaned up).

Both the federal and state Constitutions guarantee a person's right against self-incrimination. US Const, Am V; Const 1963, art 1, § 17; *People v Barritt*, 325 Mich App 556, 561; 962 NW2d 811 (2018). Law enforcement officers must therefore advise a defendant of his constitutional rights before subjecting him to a custodial interrogation. *Id*. During a custodial interrogation, if an individual "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v Arizona*, 384 US 436, 473-474; 86 S Ct 1602; 16 L Ed 2d 694 (1966). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *People v White*, 493 Mich 187, 195; 828 NW2d 329 (2013), quoting *Rhode Island v Innis*, 446 US 291, 300-302; 100 S Ct 1682; 64 L Ed 2d 297 (1980). "Statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waives his Fifth Amendment right" to remain silent. *People v Howard*, 226 Mich App 528, 538; 575 NW2d 16 (1997). Once a defendant waives his rights and answers questions, the police are only required to stop questioning when the defendant unequivocally invokes his right to remain silent. *People v Davis*, 191 Mich App 29, 36; 477 NW2d 438 (1991). A "defendant cannot have it both ways—he cannot choose to speak and at the same time retain his right to remain silent." *Id*.

"[A] suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and . . . the police must explain this right to him before questioning begins." *Davis v United States*, 512 US 452, 457; 114 S Ct 2350; 129 L Ed 2d 362 (1994). If a suspect "effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him." *Id*. at 458. "But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id*. "However, the defendant's invocation of his right to counsel must be unequivocal." *People v Tierney*, 266 Mich App 687, 711; 703 NW2d 204 (2005). Consequently, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis*, 512 US at 459.

In *People v McKinney*, 488 Mich 1054, 1054; 794 NW2d 614 (2011), our Supreme Court held that the defendant's statement that he would "just as soon wait" until he had an attorney before talking to the police was not an unequivocal assertion of the right to counsel. Likewise, in *Tierney*, 266 Mich App at 711, this Court held that the defendant's statements, "Maybe I should talk to an attorney" and "I might want to talk to an attorney," were inadequate to assert the right to counsel. And in *People v Adams*, 245 Mich App 226, 238; 627 NW2d 623 (2001), this Court held that the question, "Can I talk to [a lawyer] right now?" was not an unequivocal invocation of the right of

counsel. In *Adams*, this Court explained that this question merely represented "inquiries into the way the process worked" and was "not an actual demand for an attorney." *Id*.

In this case, after defendant was advised of his *Miranda* rights, he initially expressed his intent to ask for an attorney and not waive his rights, but he then stated that he would answer questions if he received written assurances that his sister would not be charged. The trial court found that defendant reinitiated a conversation with the police, and therefore waived his rights. The trial court found:

> [A]s soon as you invoked your right to a lawyer, you got up everything stopped. And you went back to your cell. That that statement – you had been given your rights because he was very clear to give you your rights before anything else occurred, and you then began to talk.

> And so your motion to suppress that statement is denied for the reasons that your rights had been given, and that you – and I believe that the law is clear that if you start to talk again then it's like you're waiving. You are, in fact, waiving your right to remain silent, and your right to have a lawyer at that time because you initiate the conversation. You initiated the conversation and made those statements.

The record reveals that after being advised of his rights, defendant indicated that he understood his rights and stated, "I'm not at this point waiving these rights." The detective asked defendant to write this on the "Remarks" section of the form. Without any prompting, defendant then said, "I will choose to answer the questions put to me; not a question on a question-by-question basis." The detective instructed defendant to sign and date the advice-of-rights form. The following exchange ensued:

> *Detective Jimenez.* So, you want to answer just questions and you don't want to give yourself --

> *Defendant.* No. I'm just – I'm going to make a statement to you that if you were to bring me a deal on paper that allowed my sister to walk free, that I would sign it, and gladly tell you the details of whatever might have happened. Until that deal is on paper, I would not answer any questions.

> *Detective Jimenez.* Are you sure about that?

> That's your last offer?

> *Defendant.* That's my last offer; you put that deal on paper that's fine.

> So you can tell the Prosecutor that "Save a trial. Save everything, some deal to her and I'll . . . ."

After defendant was asked if he wanted to answer questions he stated "No," but immediately thereafter and without any prompting from the detective stated: "I'm going to make a statement to you that if you were to bring me a deal on paper that allowed my sister to walk free, that I would sign it, and gladly tell you the details of whatever might have happened." Defendant

-9-

also told the detective he would choose to answer questions, but not on a "question-by-question basis."

The detective's inquiries during this exchange were not questions intended to elicit incriminating responses under *Innis*, 446 US at 300-302; *White*, 493 Mich at 195, but rather an attempt to clarify defendant's contradictory statements as to whether he intended to waive his right to answer questions. The record reveals that defendant had not been "interrogated" in violation of *Miranda* because he was neither subjected to "express questioning" nor its "functional equivalent." *Innis*, 446 US at 302-303. Similar to the facts in *Innis*, the entire conversation was short, the detective did not "harangue" defendant to try and get him to talk. Additionally, defendant initiated the conversation with the detective after stating to the detective that he did not want to talk, defendant, without prompting, immediately changed course and told the detective he did want to speak with him, albeit with certain conditions attached. As a consequence, we glean no record evidence that the detective took any action to coerce defendant into speaking to him. Additionally, the record is devoid of evidence that could lead us to conclude that defendant's reinitiating of the conversation was the direct product of direct questioning, intended to elicit a response. See, *Innis*, 446 US at 303; *White*, 493 Mich at 195-198. Rather, defendant, of his own choosing and without prompting, reinitiated a conversation with the detective, and as we have previously stated, if a suspect "reinitiates conversation" after asserting his right to counsel, law enforcement may ask questions. *Davis*, 512 US at 457.

We next examine defendant's claim that he made a specific request for counsel, and as such, under *Miranda*, all questioning should have ceased. However, defendant's argument ignores the general and long-standing rule governing such requests, namely, if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, such references are not to be construed as an unambiguous request for counsel. *Davis*, 512 US at 459. Rather, in order to assert the right to counsel under *Miranda* and its progeny, a suspect must unambiguously request counsel. As the Supreme Court observed, "a statement either is such an assertion of the right to counsel or it is not." *Smith* v. *Illinois*, 469 US 91, 97-98; 105 S Ct 490; 83 L Ed 2d 488 (1984). (brackets and internal quotation marks omitted). However, in order to operate as an assertion of the right to counsel, a suspect must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *Davis,* 512 US at 459. In *Moran* v. *Burbine*, 475 US 412, 433, n. 4; 106 S Ct 1135; 89 L Ed 2d 410 (1986) the Supreme Court stated: "The interrogation must cease until an attorney is present *only* if the individual states that he wants an attorney." (citations and internal quotation marks omitted). Further, if the statement fails to meet the requisite level of clarity, case law does not require that the officers stop questioning the suspect. See, *Edwards v Arizona*, 451 US 477, 485; 101 S Ct 1880; 68 L Ed 2d 378 (1981).

Here, defendant's post-*Miranda* statements were admissible because he did not *unequivocally* assert his right to counsel. Rather, defendant, prior to any questioning or any prompting from law enforcement volunteered that if questioned, "I'm just going to ask for an attorney." The detective responded: "We haven't been to that place yet. I haven't read you your rights." Defendant again said: "I'm just going to ask for an attorney, "to which the detective responded, "Go ahead."

Read in context, defendant's statements, "I'm *going to* ask for an attorney," reflect a desire by defendant to assert a right *in the future*. However, when the detective actually read defendant

his rights under *Miranda*, defendant responded as quoted above by engaging in conversations about making a deal for his sister in exchange for his testimony. At no time prior to or after defendant was read his rights under *Miranda* did defendant make an unequivocal request for counsel. In the absence of an unequivocal assertion of his rights, law enforcement was not required to refrain from questioning him. *Davis*, 191 Mich App at 36. Accordingly, defendant is not entitled to relief on this issue.

## VI. TESTIMONY REGARDING DEFENDANT'S PAROLE

Defendant argues in his brief on appeal that he was denied a fair trial by a witness's testimony referring to defendant's parole status. He argues that the trial court should have declared a mistrial, and alternatively, erred by failing to provide an appropriate limiting instruction. Defendant did not request a mistrial below. Although the trial court initially indicated that it would provide an instruction, one was never given. However, defendant did not request an instruction or object to the instructions as given. Therefore, these issues are unpreserved. A trial court's decision whether to grant a mistrial is generally reviewed for an abuse of discretion. *People v Dennis*, 464 Mich 567, 572; 628 NW2d 502 (2001). However, unpreserved issues are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

Before trial, the parties agreed that Amy Cassavoy could testify that an unnamed person called her trying to locate defendant. After further discussions, the prosecutor asked that Cassavoy be permitted to testify that it was defendant's parole officer who was looking for defendant for the limited purpose of showing that defendant failed to contact his parole officer after the offense, which was relevant to show defendant's consciousness of guilt. The trial court allowed the testimony for this limited purpose. Cassavoy testified that she tried to contact defendant because a person was trying to reach him, but she did not know who the person was. The prosecutor asked, "Was it his parole officer?" She replied, "I don't recall." Her testimony continued:

> *Q*. What was the reason that you [sic] trying to contact [defendant] after he left?
>
> *A*. Someone was trying to, um, get ahold of him. I don't remember the name.
>
> *Q*. Uh, if you don't remember the person's name, do you remember who the person was that was trying to get in touch with him?
>
> *A*. No.
>
> *Q*. Okay. Was it his parole officer?
>
> *A*. Uh, I don't recall.
>
>                * * *
>
> *THE COURT*. Well, Ms. Cassavoy, we had a conversation, uh, outside the presence of the jury just before the jury came out and I thought we were clear on this issue.

Um, I don't take kindly to witnesses fudging their testimony under oath because you're under oath now.

*THE WITNESS*. I understand that. But I though[t] you guys told me not to do it.

THE COURT. No. We told you you could do it. You totally misunderstood the instructions.

\* \* \*

*THE WITNESS*. I think that's – you know, you're, you're --

*THE COURT*. So now answer Mr. –

*THE WITNESS*: -- asking me to lie to begin with –

*THE COURT*. No. Nobody's asking you to lie.

*THE WITNESS*. – out in the hallway.

*THE COURT*. Nobody's ask – they're asking you, we're asking you not to lie. We're not –

*THE WITNESS*. Okay. Well then you guys brought up the issue don't let the jury know –

*THE COURT*. I just told you . . . go ahead and answer the questions honestly and completely. That's what I told you. That's what I told you. You just misunderstood it.

Cassavoy then stated that defendant's parole officer called trying to contact defendant.

## A. MISTRIAL

The basis of defendant's claim for a mistrial is that he was prejudiced by Cassavoy's testimony. Generally, a trial court "should only grant a mistrial for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial and when the prejudicial effect of the error cannot be removed in any other way." *People v Lane*, 308 Mich App 38, 60; 862 NW2d 446 (2014) (quotation marks and citations omitted). As a general rule, "an unresponsive, volunteered answer to a proper question is not grounds for the granting of a mistrial." *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995). Cassavoy's statement about not wanting to lie was not responsive to any questioning. Nothing in the record provides a basis for a finding that the prosecutor expected Cassavoy to misunderstand the instructions and would express confusion. Moreover, Cassavoy's statement was not prejudicial to defendant. Contrary to what defendant asserts, her responses did not suggest that it was defendant who was trying to mislead the jury. First, her remarks were made in response to questioning by the prosecutor. Second, when Cassavoy expressed confusion about what she was permitted to say,

the trial court remarked that "*we* had a conversation," "*we* told you you could do it," and "*we're* not asking you to lie," and Cassavoy remarked that she thought "*you guys* told me not to do it" and "*you guys* brought up the issue." These responses did not suggest that defendant was trying to mislead the jury. Accordingly, there was no basis for a mistrial.

Although the trial court indicated that it would instruct the jury that the parole testimony could be considered only to show defendant's consciousness of guilt, there is no indication in the record that such an instruction was given. However, defendant did not object to the trial court's instructions. We conclude that the omission of a jury instruction did not affect defendant's substantial rights because (1) the jury was already aware that defendant was a convicted felon because of the felon-in-possession charge, (2) the nature of defendant's parole offense was not disclosed, and (3) there is no suggestion that the prosecutor urged the jury to consider the evidence for an improper purpose. Accordingly, defendant is not entitled to relief on this basis.

## B. EVIDENTIARY ISSUE[2]

In his Standard 4 brief, defendant argues that the testimony that his parole officer was trying to contact him should have been excluded because it was inadmissible under MRE 404(b)(1) and because it was unduly prejudicial under MRE 403. Although defendant argued below that the testimony should be excluded under MRE 403, he did not argue that it was inadmissible under MRE 404(b)(1). Therefore, we review the trial court's MRE 403 ruling for an abuse of discretion, *People v Watkins*, 491 Mich 450, 467; 818 NW2d 296 (2012), and we review defendant's MRE 404(b)(1) claim for plain error affecting defendant's substantial rights, *People v Brown*, 326 Mich App 185, 195; 926 NW2d 879 (2018).

MRE 404(b)(1) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

It is a "deeply rooted and unwavering principle that other-acts evidence is inadmissible for propensity purposes." *People v Denson*, 500 Mich 385, 397; 902 NW2d 306 (2017). "This rule reflects the fear that a jury will convict a defendant on the basis of his or her allegedly bad character rather than because he or she is guilty beyond a reasonable doubt of the crimes charged." *Id*. Admission of other-acts evidence involves the following considerations:

First, the prosecutor must offer the "prior bad acts" evidence under something other than a character or propensity theory. Second, "the evidence must be relevant under MRE 402, as enforced through MRE 104(b)[.]" Third, the probative value of the

---

[2] This part of the issue was raised in defendant's Standard 4 brief.

-13-

evidence must not be substantially outweighed by unfair prejudice under MRE 403. Finally, the trial court, upon request, may provide a limiting instruction under MRE 105. [*People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004), quoting *People v VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114 (1993).]

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Generally, relevant evidence is admissible except as otherwise provided by law. MRE 402. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." MRE 403.

To the extent that the evidence of defendant's parole status was evidence of a prior bad act, it was not inadmissible under MRE 404(b)(1) because it was not offered to prove propensity. The prosecutor offered the evidence to show defendant's consciousness of guilt. Defendant's failure to respond to the urgent message that he was violating his parole was relevant to show his consciousness of guilt. Further, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under MRE 403. Defendant stipulated to the fact that he had a prior felony conviction that rendered him ineligible to possess a firearm. That stipulation reduced the prejudicial impact of the evidence that defendant was still on parole. Further, the nature of the offense for which defendant was on parole was not disclosed. The trial court did not abuse its discretion by ruling that any prejudicial effect arising from the testimony did not substantially outweigh its probative value. Thus, the trial court did not err by allowing the evidence at trial.

## VII. COMMENTS REGARDING DEFENDANT'S SILENCE

Defendant argues through both appellate counsel and in his Standard 4 brief that the prosecutor made several improper references to his silence during cross-examination and again during closing argument. Because defendant did not object to any of the questions or comments at trial, these claims are unpreserved. *People v Unger (On Remand)*, 278 Mich App 210, 235; 749 NW2d 272 (2008). We review unpreserved claims of prosecutorial misconduct for plain error affecting defendant's substantial rights. *People v Abraham*, 256 Mich App 265, 274; 662 NW2d 836 (2003).

Claims of prosecutorial misconduct are reviewed to determine whether "the prosecutor committed errors during the course of trial that deprived [the] defendant of a fair and impartial trial." *People v Cooper*, 309 Mich App 74, 88; 867 NW2d 452 (2015). "As a general rule, if a person remains silent after being arrested and given *Miranda* warnings, that silence may not be used as evidence against that person." *Shafier*, 483 Mich at 212, citing *Wainwright v Greenfield*, 474 US 284, 290-291; 106 S Ct 634; 88 L Ed 2d 623 (1986). "Therefore, in general, prosecutorial references to a defendant's post-arrest, post-*Miranda* silence violate a defendant's due-process rights under the Fourteenth Amendment of the United States Constitution." *Shafier*, 483 Mich at 212-213, citing *Wainwright*, 474 US at 290-291; see also *Doyle v Ohio*, 426 US 610, 618-620; 96 S Ct 2240; 49 L Ed 2d 91 (1976); *People v Borgne*, 483 Mich 178, 186; 768 NW2d 290 (2009). In *People v Cetlinski*, 435 Mich 742, 746-747; 460 NW2d 534 (1990), our Supreme Court held that "the use for impeachment purposes of a defendant's prior statement, including omissions, given during contact with the police, prior to arrest or accusation, does not violate the defendant's

constitutional rights as guaranteed under the Fifth and Fourteenth Amendments or the Michigan Constitution." Further, "when an individual has not opted to remain silent, but has made affirmative responses to questions about the same subject matter testified to at trial, omissions from the statements do not constitute silence." *Id*. at 749.

In this case, the prosecutor stated during closing argument:

He [defendant] has an ultimate right to remain silent, right. If he had chosen not to testify in this case, I wouldn't even be allowed to comment on it.

You heard Detective Jimenez when they met in New Jersey go over his rights with him. And one of those rights was you have a right to remain silent. And Mr. Govett acknowledged that.

He was well versed in the law. He knows what the *Miranda* rights are. He says I know what these mean. I'm choosing not to waive these rights. But if you give me a, a piece of paper that says my sister gets a deal, then I'll tell you about the facts on Sherwood Street.

So that's the first time that we get a hint that he knows or that he may have information about what happened on Sherwood.

As discussed earlier, by offering to provide information after initially declining to waive his rights, defendant did not unequivocally assert his right to remain silent. Defendant reinitiated the discussion with the detective by stating that he would reveal his knowledge of what happened on Sherwood after his sister's situation was assured. Because defendant did not unequivocally assert his right to remain silent, and instead affirmatively made statements suggesting that he could provide information about what happened on Sherwood, the prosecutor properly could comment on those statements, including any omissions. *Cetlinski*, 435 Mich at 749.

Defendant also cites instances from the prosecutor's cross-examination that he argues were improper attempts to suggest that defendant's invocation of his right to silence made his self-defense claim not credible. The prosecutor played the video of defendant's discussion with the detective and asked defendant if he was deciding to exercise his right to remain silent. After several nonresponsive statements, defendant stated, "I'm not exercising my right to silence. I'm saying there's a condition to my cooperation." The prosecutor asked defendant if he told the police about self-defense immediately after receiving *Miranda* warnings, and if he stated his position before the detective asked him a question. The prosecutor asked, "And the thing that you said to him was a strategy on your part?" Defendant explained that he wanted to protect his sister from "overzealous prosecution." The prosecutor asked, "Is the self-defense story what had happened or is the self-defense story what your defense is going to be?" Defendant replied, "It's what happened" and he stated that he understood the distinction. Defendant did not object to these questions. We conclude, consistent with our earlier discussion, that the prosecutor's cross-examination was not improper because defendant waived his right to remain silent by affirmatively speaking and offering to provide information in exchange for his sister's favorable treatment. Indeed, defendant acknowledged at trial that he was "not exercising my right to silence." Defendant's omission of any self-defense claim comes within the *Cetlinski* holding that a

defendant's omissions from voluntary statements may permissibly be used as impeachment. *Cetlinski*, 435 Mich at 749.

Defendant also challenges several portions of the prosecutor's closing argument in which the prosecutor stated that defendant waived his right to remain silent and did not assert self-defense, and argued that defendant fabricated the self-defense story after learning what evidence the police had against him. These arguments do not single out defendant's post-*Miranda* silence. Rather, the arguments address defendant's failure to raise the self-defense claim before trial, including his failure to tell his sister. They emphasize that defendant's self-defense allegations did not emerge until defendant became aware of the evidence that would be offered against him. They attack defendant's credibility and the veracity of his claim of self-defense. A prosecutor properly may argue that a defendant is not worthy of belief, *Howard*, 226 Mich App at 548, and motive and opportunity to fabricate are permissible areas of inquiry and comment, *People v Buckey*, 424 Mich 1, 15; 378 NW2d 432 (1985). To the extent that the prosecutor's arguments addressed defendant's omissions in the discussion with the interviewing detective, they are acceptable because defendant waived his right to silence and omissions are acceptable impeachment. *Id*. As such, defendant is not entitled to relief on this issue.

## VIII. REMAINING ISSUES IN DEFENDANT'S STANDARD-4 BRIEF

### A. VICTIM'S PRIOR VIOLENT ACTS

Defendant argues that the trial court erred by excluding testimony from witness Amy Cassavoy regarding (1) an incident in which Bouford attacked defendant with a box cutter, and (2) an incident in which McBride threatened another drug user with a gun. We review the trial court's decisions to exclude this testimony for an abuse of discretion. *Jackson*, 498 Mich at 257.

With respect to admissible evidence of a victim's character for violence, MRE 404 provides, in relevant part:

> (a) Character evidence generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
>
> * * *
>
> (2) *Character of alleged victim of homicide*.
>
> When self-defense is an issue in a charge of homicide, evidence of a trait of character for aggression of the alleged victim of the crime offered by an accused[.]
>
> * * *
>
> (b) Other crimes, wrongs, or acts.
>
> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity,

intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

MRE 405 provides:

(a) Reputation or Opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into reports of relevant specific instances of conduct.

(b) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

Applying these rules in the context of self-defense, "evidence of a victim's aggressive character is admissible in the form of reputation evidence," and "evidence of the decedent's specific acts of violence is admissible only to prove an essential element of self-defense, such as a reasonable apprehension of harm." *People v Edwards*, 328 Mich App 29, 36-37; 935 NW2d 419 (2019), citing *People v Harris*, 458 Mich 310; 583 NW2d 680 (1998). To prove self-defense, a defendant must present evidence "that he had a reasonable belief that he had to use deadly force to prevent his own death or to prevent great bodily harm to himself." *Id*. at 37. Evidence of the victim's violent acts known to the defendant "is directly relevant to an ultimate issue in [the defendant's] defense." *Id*. at 38.

In this case, the trial court did not completely exclude evidence of the box-cutter incident. It allowed defendant to offer his own testimony that Bouford previously came after him with a box cutter during a prior argument. With respect to Cassavoy's testimony, the trial court sustained the prosecutor's objection after clarifying that Cassavoy did not have personal knowledge of the incident. "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." MRE 602. Because Cassavoy did not have personal knowledge of the box-cutter incident, the trial court did not abuse its discretion by excluding her testimony on that subject.

Cassavoy did have personal knowledge of McBride previously threatening someone with a weapon, but this incident was relevant to defendant's state of mind only if defendant had knowledge of that incident. *Harris*, 458 Mich at 316-319; *Edwards*, 328 Mich App at 37-38. Defendant did not establish a foundation for Cassavoy's testimony by introducing evidence that defendant was present during this incident. Therefore, the trial court did not abuse its discretion by excluding her testimony as to this evidence of McBride's character. We further note that the trial court did not prohibit defendant from otherwise offering testimony on this subject to the extent that he had knowledge of McBride's prior threat.

B. VOIR DIRE

Defendant argues that the trial court erred by conducting jury voir dire itself, but refusing to ask some proposed questions submitted by defendant. The trial court's conduct of voir dire is

reviewed for an abuse of discretion. *People v Williams*, 241 Mich App 519, 522; 616 NW2d 710 (2000).

Voir dire of prospective jurors is governed by MCR 6.412(C), which provides:

> (1) *Scope and Purpose*. The scope of voir dire examination of prospective jurors is within the discretion of the court. It should be conducted for the purposes of discovering grounds for challenges for cause and of gaining knowledge to facilitate an intelligent exercise of peremptory challenges. The court should confine the examination to these purposes and prevent abuse of the examination process.

> (2) *Conduct of the Examination*. The court may conduct the examination of prospective jurors or permit the lawyers to do so. If the court conducts the examination, it may permit the lawyers to supplement the examination by direct questioning or by submitting questions for the court to ask. On its own initiative or on the motion of a party, the court may provide for a prospective juror or jurors to be questioned out of the presence of the other jurors.

"A defendant who chooses a jury trial has an absolute right to a fair and impartial jury. The purpose of voir dire is to elicit enough information for development of a rational basis for excluding those who are not impartial from the jury." *People v Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994) (opinion by MALLETT, J.). Although voir dire is the defendant's safeguard for ensuring an impartial jury, a defendant does not have the right to have his attorney conduct voir dire, or to have the trial court ask questions submitted by his attorney. *Id.* at 619. "In reviewing the trial court's conduct, this Court must determine whether the trial court conducted a voir dire 'sufficiently probing . . . to uncover potential juror bias.' " *People v Sawyer*, 215 Mich App 183, 187; 545 NW2d 6 (1996), quoting *Tyburski*, 445 Mich at 609.

Defendant requested that the trial court ask the jurors, "Does anyone know anyone who suffers from addiction?" Defendant argued that the question was necessary to determine whether prospective jurors harbored negative attitudes toward drug addicts that would render them incapable of objectively considering defendant's self-defense claim. The proposed inquiry would not have revealed the perceived prejudice defendant was seeking to unmask as review of the record made clear that all of the persons at the Sherwood house were drug users or dealers. Attitudes about addiction would not be to the advantage or disadvantage of one side or the other.

Defendant also asked the court to voir dire the jurors to determine their views about gun ownership. We agree with the trial court that this question was not relevant to the circumstances of the case. Neither gun ownership nor the rights of gun owners were an issue in the case.

Finally, with respect to self-defense, defendant's specific question was, "Does anyone have any objection to the Michigan law that provides self-defense?" The trial court declined to ask this question because it would be instructing the jury on self-defense, as well as the jury's obligation to follow the court's instructions. Defendant's self-defense theory did not involve any unusual legal nuances that could affect a juror's judgment. Accordingly, the trial court did not abuse its discretion by refusing to question the jurors on that subject specifically during voir dire.

For the reasons stated above, defendant is not entitled to relief on these issues.

## C. ATTORNEY FEES

Defendant challenges the trial court's assessment of $400 for attorney fees at sentencing. Defendant argues that the court was not permitted to assess attorney fees because defendant represented himself in the trial court. Whether the trial court was authorized to assess attorney fees where defendant represented himself in the trial court is a question of law, which is reviewed de novo. *Miller*, 326 Mich App at 726.

MCL 769.1k(1)(b)(*iv*) authorizes a trial court to impose at sentencing costs for "[t]he expenses of providing legal assistance to the defendant." Defendant cites an unpublished decision in which this Court vacated an award of attorney fees where the defendant represented himself at trial and objected to the appointment of standby counsel. However, in this case, defendant did not object to the appointment of standby counsel. Review of the record reveals that standby counsel assisted defendant in that capacity throughout the proceedings, including at trial. Under MCL 769.1k(1)(b)(*iv*), the court was authorized to impose an assessment for "[t]he expenses of providing legal assistance to the defendant." Because defendant was aided by a court-appointed attorney who provided legal assistance as standby counsel, and defendant did not object to counsel serving in that capacity, the trial court did not err by assessing attorney fees. Although defendant does not challenge the amount of the assessment, we conclude that the nominal amount is consistent with standby assistance rather than full representation. Accordingly, we find no error.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello
/s/ Mark T. Boonstra

-19-